**Paula Corbin JONES, Plaintiff,**

v.

**William Jefferson CLINTON and Danny Ferguson, Defendants.**

No. LR–C–94–290.

United States District Court,
E.D. Arkansas,
Western Division.

Dec. 28, 1994.

Daniel M. Traylor, Traylor Law Firm, Little Rock, AR, and Gilbert K. Davis and Joseph Cammarata Fairfax, VA, for plaintiff.

Kathlyn Graves, Wright, Lindsey & Jennings, Stephen C. Engstrom, Wilson, Engstrom, Corum, Dudley & Coulter, Little Rock, AR, and Robert S. Bennett, Skadden, Arps, Slate, Meaghen & Flom, Washington, DC, for defendants.

Bill W. Bristow, Seay & Bristow, Jonesboro, AR and Robert Batton, Jacksonville, AR, for Mr. Ferguson.

### MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

The Plaintiff, Paula Corbin Jones, filed a damage suit against the Defendants William Jefferson Clinton and Danny Ferguson to recover for acts which were alleged to have taken place primarily while Defendant Clinton was Governor of Arkansas and Defendant Ferguson was a Trooper with the Arkansas State Police assigned to the Governor. Subsequently, in the General Election of November, 1992, Mr. Clinton was elected President of the United States and assumed that office on January 20, 1993.

The complaint was filed on May 6, 1994, and was predicated on an alleged incident which was said to have occurred on May 8, 1991. The action alleged sexual harassment and conspiracy pursuant to 42 U.S.C. §§ 1983 and 1985, which are provisions included in civil rights legislation of the reconstruction era. It also alleged state law claims of defamation and outrage.

Defendant Ferguson responded to these allegations by, in essence, denying any which might involve questionable activities on his part. Defendant Clinton responded with a motion to bifurcate the briefing schedule so as to permit the question of Presidential

immunity to be argued on a motion to dismiss before any other questions were presented. On July 21, 1994, the Court entered a Memorandum and Order allowing President Clinton to file a motion to dismiss on the basis of Presidential immunity and deferring and preserving the filing of any other motions or pleadings until the issue of Presidential immunity had been resolved. *Jones v. Clinton*, 858 F.Supp. 902 (E.D.Ark.1994). The Court noted that this order was purely procedural in nature and addressed only the question of whether Presidential immunity would be considered as a threshold issue. *Id.* at 907 n. 6.

The basic issue, therefore, which this Memorandum Opinion and Order addresses is whether a civil action may be asserted against the President of the United States while he is in office when the fact situation alleged in the complaint arose before his election and assumption of office.

## I.

### *Absolute Immunity of the President from Civil Suit*

The President has asserted that he may not be sued in a civil action while sitting as President, even when the facts asserted by the Plaintiff occurred, if at all, before he was elected or assumed the office. This, of course, is a claim of absolute immunity. The President would have the Court dismiss the complaint while preserving through some equitable tolling of the statute of limitations the right of Ms. Jones to sue him civilly as soon as he left office. The Justice Department in its Statement of Interest of the United States also argued for immunity, but urged the Court in the alternative simply to stay the proceedings until the President had left office. Ms. Jones argued against immunity, but also argued alternatively for dismissal with an automatic reinstatement on the Court's docket on the last day of his Presidency and against a stay. All briefs discussed at some length the intent of the framers of the Constitution and interpretations of various scholars and judges relating to this subject, and all were thorough and well researched.

### A. *The English Legacy*

The Court believes that the place to begin this discussion, before coming to the vital question of constitutional interpretation, is in English law and the development of the rights and liberties of the English people. The rights and liberties of England became our inheritance. The Constitution of the United States and the constitutions of the states contain provisions that come directly from that source.

Almost all of the states adopted "reception statutes" receiving into state law the English common law and acts of Parliament as they existed as of a certain date—which was usually 1607, 1620, or 1776—except to the extent that they were contrary to our federal or state constitutions or statutes or were contrary to our form of government. Arkansas adopted such a statute shortly after becoming a state. Ark.Code Ann. § 1–2–119 (Michie 1987); Ark.Stat.Ann. § 1–101 (1976 Repl.); discussed in *Moore v. Sharpe*, 91 Ark. 407, 121 S.W. 341 (1909). The statute adopted the English common law, subject to the stated limitations, as it existed prior to the fourth year of James I. Various English statutes or common law rules passed into Arkansas law as a result. *E.g. Biscoe v. Thweatt*, 74 Ark. 545, 86 S.W. 432 (1905) (Statute of Charitable Uses); *Horsley v. Hilburn*, 44 Ark. 458 (1884) (Rule in Shelley's Case implicitly recognized but not applied to fee tail pursuant to superseding Arkansas statute); *Moody v. Walker*, 3 Ark. 140 (1840) (Rule Against Perpetuities). Also received were those portions of the Magna Carta relating to due process of law, equal protection, trial by jury, and rights unrelated to the feudal system.

The Magna Carta was largely a restatement of feudal law pertaining to land tenures and their incidents, and thus most of it has no application here. However, in addition to enshrining in English law some of our basic rights and liberties, it constituted a series of limitations placed upon the King and his authority. There would follow in English history a long and bloody struggle to define the rights of the monarchy as opposed to

Parliament and the citizenry and also to the common law itself.

The tension between the King and Parliament, on the one hand, and the King and the common law, on the other, reached its heights with the ascension to the throne of the Stuart monarchy in the person of King James the First (who was James the Sixth of Scotland). Friction soon arose between the King and the House of Commons. At the root of the disagreement, once again, was the Magna Carta. *See generally* William Swindler, *Magna Carta: Legend and Legacy* 169–176 (1965).

An important participant in all of this was Sir Edward Coke, whose writings had an enormous influence on English and American law, and who had served as Solicitor General and later Attorney General under Queen Elizabeth I and also as Chief Justice of the Court of Common Pleas. He subsequently would become Chief Justice of the King's Bench under King James I. *See* 3 Roscoe Pound, *Jurisprudence* 428 (1959). Under Elizabeth, as her attorney, Coke had been a staunch defender of the Crown, but as a judge, he would quote Bracton to King James: "The King ought to be under no man, but under God and the law." Swindler, *supra*, at 172. He also stated in *Dr. Bonham's Case*, 8 Co. 113b, 118a, 77 Eng.Rep. 646, 652 (1610): "And it appears in our bodies, that in many cases the common law will control acts of Parliament, and sometimes adjudge them to be utterly void" if they are "against common right and reason." William B. Lockhart et al., *The American Constitution* 251 (5th ed. 1981). That was unlikely to be a true statement of the law in the early 17th Century, but to the extent that it was precedent, it may be said to be an early expression of judicial review.

None of this and other frictions set well with the King, and Coke was dismissed from the bench, turning his efforts to Parliament. The continuing friction between Parliament and James' successor, King Charles I, ultimately led to the adoption of the Petition of Right, which in essence ratified and extended the Magna Carta, and in effect further limited the prerogatives of the Crown. A defining moment came when the House of Commons rejected a proposal of the House of Lords that would add a clause recognizing the sovereignty of the King. Coke gave this fulmination:

> I know that prerogative is part of the law, but sovereign power is no Parliamentary word; in my opinion, it weakens Magna Carta and all our statutes; for they are absolute without any saving of sovereign power. And shall we now add to it, we shall weaken the foundation of law, and then the building must needs fall; take we heed what we yield unto—Magna Carta is such a Fellow, he will have no Sovereign.

Swindler, *supra*, at 185.

The Petition of Right was one of the foundation stones of the English Constitution. It enlarged upon the Magna Carta as a constitutional limitation upon the power of the monarchy. It made it apparent that the King's prerogative was limited. *Sub Deo et Lege*[1] was the law of the land.

---

1. In *Prohibitions Del Roy*, 77 Eng.Rep. 1342, 1343, 12 Co.Rep. 64, 65 (K.B.1608), Lord Coke wrote:

   [B]ut His Majesty was not learned in the law of his realm of England, and causes which concern the life, or inheritance, or goods, or fortunes of his subjects, are not to be decided by natural reason but by the artificial reason and judgment of law, which law is an act which requires long study and experience, before that a man can attain to the cognizance of it: that the law was the golden met-wand and measure to try the causes of the subjects; and which protected His Majesty in safety and peace: with which the King was greatly offended, and said, that then he should be under the law, which was treason to affirm, as he said; to which I said, that Bracton saith, *Quod Rex non debet esse sub homine, sed sub Deo et lege*. [That the King ought not to be under any man, but under God and the law.] quoted in David Mellinkoff, The Language of the Law 203 (1963).

   In Catherine Drinker Bowen's book, *The Lion and the Throne*, the situation which led to this opinion is discussed in some detail. The events of this period in English legal and political history were conclusive in determining the end of "the divine right of Kings" and subjecting the King to the law. This is historically important to us in that the founding fathers cast very little light (outside of the impeachment provision) upon suits against the President, and this matter was never addressed by Congress in passing laws enacted pursuant to the Constitution. It must be assumed that the rights of the President do not

## B. *The American Experience*

In the formulation of Article II of the Constitution, there were varying viewpoints as to the office of the President.[2] Some, such as Roger Sherman of Connecticut, believed that the President should be "nothing more than an instrument for carrying the will of the Legislature into effect," while others, such as Gouverneur Morris of Pennsylvania, thought the President should be "the guardian of the people, even of the lower classes, against Legislative tyranny." Arthur Schlesinger, Jr., *The Constitution:* *Article II*, in An American Primer 121–22 (Daniel J. Boorstin ed., 1968). What resulted was the compromise that we have today, amended only slightly from the original. It sets out the powers and duties of the Executive Branch (*i.e.*, the President and the administrators he appoints), but it does not address the immunity question.

A large part of the problem, aside from the silence of the Constitution, is that for all practical purposes, the Executive Branch, unlike the Congress and the Supreme Court, consists of only one person. His administra-

---

rise above the rights of an English monarch in the early 17th Century.

Despite these statements by Lord Coke that the King was subject to the law, there existed contemporaneously in England the rule that "the King can do no wrong," a relic presumably rooted in the divine right of Kings. Blackstone expressed it this way:

Besides the attribute of sovereignty, the law also ascribes to the King, in his political capacity, absolute *perfection*. The King can do no wrong: which ancient and fundamental maxim is not to be understood, as if every thing transacted by the government was of course just and lawful, but means only two things. First, that whatever is exceptionable in the conduct of public affairs, is not to be imputed to the King, nor is he answerable for it personally to his people; for this doctrine would totally destroy that constitutional independence of the crown, which is necessary for the balance of power in our free and active, and therefore compounded, constitution. And, secondly, it means that the prerogative of the crown extends not to do any injury; it is created for the benefit of the people, and therefore cannot be exerted to their prejudice.

The King, moreover, is not only incapable of *doing* wrong, but even of *thinking* wrong; he can never mean to do an improper thing; in him is no folly or weakness.

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 246 (Chitty ed. 1855) (emphasis in the original).

Of course, when Blackstone published his *Commentaries*, this idea was already ludicrous in the light of the history of the English monarchy. A litany of the wrongs, weaknesses and sins of English kings would establish that they were not only capable of "doing wrong" but also of "thinking wrong" and were replete with folly and weakness.

The English concept of kingship never entered into the law of the United States, although in England it apparently "exists today to give the Queen an absolute immunity from being sued for personal torts in the civil courts." R.J. Gray, *Private Wrongs of Public Servants*, 47 CAL.L.REV. 303, 307 (1959). *See also* Mayer G. Freed, *Exec-* *utive Official Immunity for Constitutional Violations: An Analysis and a Critique*, 72 NW.U.L.REV. 526 (1977).

States did not adopt through the reception statutes those aspects of English law relating to the monarchy since kings and queens are contrary to our form of government. Thus what remains of our English heritage on this point are the basic documents of English liberties—the Magna Carta, the Petition of Right, Habeas Corpus, and the English Bill of Rights.

Moreover, as Chief Justice John Marshall pointed out in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803), the King is subject to being "sued" in the form of a petition "and he never fails to comply with the judgment of his court."

2. Russell Kirk cites Sir Henry Maine for the proposition that "the office of the President really is the office of a King—the chief difference being that the American President is subject to election, at fixed terms, and that the office is not hereditary." He adds: "Maine even suggests that the framers of the Constitution may have had in mind the powers of George III, when they established the powers of the American presidency." He continues in that vein discussing how powerful an office it is. He adds, however, that the restraint exercised by the first six presidents prevented the reduction of the legislative and judicial branches "to insignificance." RUSSELL KIRK, THE ROOTS OF AMERICAN ORDER 427–428 (1974). This seems to be an exaggeration, however, since during that period of time, the opinions of Chief Justice John Marshall sufficed to prevent the Executive Branch from subverting the Judicial Branch, although the first six presidents did exercise substantial restraint, particularly Washington and Adams. It seems much more likely that in providing for the Executive Branch, the founders did not have George III in mind at all, except in an unfavorable sense. The "George" that they likely had in mind was George Washington. The Executive Branch was probably modeled for the first man to occupy it—which may explain why even the insertion of an impeachment provision for criminal offenses was a matter of debate.

tive appointees serve at his pleasure. Thus, a large part of the President's assertion may be summarized in the proposition that, without immunity, to cripple the Presidency in one way or another in civil litigation is to deliver a blow to and weaken the effectiveness of the entire Executive Branch of government which in effect is only one person, the President.

The importance of unimpeded, independent branches of government is discussed by Alexander Hamilton[3] in *The Federalist No. 51:*

> Were the executive, magistrate, or the judges not independent of the legislature in this particular, their independence in every other would be merely nominal ... [We must give] to those who administer every department the necessary constitutional means and personal motives to resist encroachments of the others.... The interest of the man must be connected with the constitutional rights of the place. It may be a reflection on human nature that such devices should be necessary to control the abuses of government. But what is government itself but the greatest of all reflections on human nature? If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

I *The People Shall Judge* 312, 313 (University of Chicago Social Science Staff 1949). He is speaking of independence from other branches, but also of the responsibility that goes along with it.

The President and his lawyers, in arguing the immunity issue, seem to place substantial reliance on the intention of the framers of the Constitution. Much of what they argue relates to the impeachment process. For example, they seize in their brief upon this commentary by Hamilton from *The Federalist No. 69:* "The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of the law." Of course, Hamilton was talking about *impeachment* under Article II, Section 4, under which the President may be "removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." That has nothing to do with immunity from civil suit. Article II, and Hamilton, were addressing criminal conduct on the part of the President.

This is not to say, however, that the question of Presidential immunity from suit was not discussed at the Constitutional Convention or during the years immediately following. Justice Lewis Powell addresses this in speaking for the majority of the Court in *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982):

> [T]here is historical evidence from which it may be inferred that the Framers assumed the President's immunity from damages liability. At the Constitutional Convention several delegates expressed concern that subjecting the President even to impeachment would impair his capacity to perform his duties of office. See 2 M. Farrand, Records of the Federal Convention of 1787, p. 64 (1911) (remarks of Gouverneur Morris); *id.,* at 66 (remarks of Charles Pinckney). The delegates of course did agree to an Impeachment Clause. But nothing in their debates suggests an expectation that the President would be subjected to the distraction of suits by disappointed private citizens. And Senator Maclay has recorded the views of Senator Ellsworth and Vice President John Adams—both delegates to the Convention—that 'the President, personally, was not the subject to any process whatever.... For [that] would ... put it in the power of a common justice to exercise any authority over him and stop the whole machine of Government.' Journal of William Maclay 167 (E. Maclay ed. 1890).

---

3. Some attribute this paper to James Madison. In I THE PEOPLE SHALL JUDGE 312 (University of Chicago Social Science Staff 1949), its author is listed "Hamilton or Madison."

457 U.S. at 751–52 n. 31, 102 S.Ct. at 2701–02 n. 31.

Justice Powell also quoted from Justice Joseph Story's *Commentaries on the Constitution of the United States* to this effect:

'There are ... incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them ... The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases at least, to possess an official inviolability.' 3 J. Story, Commentaries on the Constitution of the United States Sec. 1563, pp. 418–419 (1st ed. 1833).

457 U.S. at 749, 102 S.Ct. at 2701.

But just as the English law moved from the divine right of kings assertion to the assertion of Lord Coke and Parliament that the King was under God and the law, the situation in American law prior to *Fitzgerald* had proceeded essentially in the same direction with regard to the office of President. For example, it has been pointed out that when Hamilton made the statement quoted previously from *The Federalist No. 69,* "he was referring to his own plan" rather than reciting faithfully what had been proposed. Raoul Berger, *Selected Writings on the Constitution* 46–47 n. 94 (1987). Moreover, the discussion at the Constitutional Convention revolved around the impeachment process, the basis for which was the commission of "high crimes and misdemeanors." Although Justice Story, writing several decades later, discusses civil cases, as previously quoted, he is writing from the perspective of someone who was a boy at the time of the Convention—although admittedly he was rather close in time to those proceedings. He was successful in that what he wrote was embodied in *Fitzgerald.* There was much opposition even to the impeachment provision; some thought that the Supreme Court should conduct the trial rather than the Senate. James Madison was an advocate of that view, although Gouverneur Morris thought that "no other tribunal than the Senate could be trusted" and believed that the Supreme Court "were too few in number and might be warped or corrupted." 2 *Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America* 535 (reported by James Madison) (Gaillard Hunt & James Brown Scott, eds., 1987).

The disagreement over Presidential immunity at the Constitutional Convention carried over into the years that followed. In *United States v. Burr,* 25 F.Cas. 30 (C.C.D.Va.1807) (No. 14,692d), Chief Justice John Marshall ruled that a *subpoena duces tecum* could be issued to President Thomas Jefferson. Jefferson protested strongly, arguing that the three branches of government had to be independent of each other, including independence by the executive from the judiciary. (Discussed in *Nixon v. Fitzgerald,* 457 U.S. at 751 n. 31, 102 S.Ct. at 2701–02 n. 31.) In *Livingston v. Jefferson,* 15 F.Cas. 660 (C.C.D.Va.1811) (No. 8,411), damages were sought for alleged trespass committed by a federal officer at the direction of Jefferson, but a federal court dismissed it for having been brought improperly in Virginia. The immunity issue was not reached. Of course, even before these cases, the argument of total independence of the Executive Branch from judicial action had been settled in large part by *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This case is remembered for the recognition and use of judicial review by the Supreme Court of an Act of Congress, but it also directed by mandamus that Secretary of State James Madison deliver Marbury's justice of the peace commission to him contrary to the desires of President Jefferson. While not bearing upon the immunity question directly, it was apparent that the Executive Branch was not immune from action by the Judicial Branch in enforcing mandates of the Constitution. In fact, Chief Justice Marshall said of Marbury's rights and remedies: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." 5 U.S. (1 Cranch) at 163.

However, in *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1867), the Supreme Court refused to enjoin President Andrew Johnson from enforcing the Reconstruction Acts. Chief Justice Salmon P. Chase, writing for a unanimous Court, declined to enjoin enforcement of the legislation even though it was allegedly unconstitutional. He distinguished *Marbury* by stating that it only related to *ministerial duties* involving *no discretion* while these Acts related to "executive and political" duties involving broad discretion. To enjoin the President would be to restrain him from carrying out his constitutional responsibility to execute the laws. Enjoining him would threaten the separation of powers between the branches and the independence of the President. *See similarly, Kendall v. United States,* 37 U.S. (12 Pet.) 524, 610, 9 L.Ed. 1181 (1838), and *National Treasury Employees Union v. Nixon,* 492 F.2d 587, 608–612 (D.C.Cir.1974).

Of course, the complaint of Paula Corbin Jones in this civil case relates neither to the ministerial nor the executive duties of the President. The allegations relate to alleged conduct of the President while he was Governor of Arkansas. (The allegations, it might be noted, also do not relate to any ministerial or executive duty of the Office of Governor.) The Justice Department, in its brief, stated that it knew of only three private suits based on pre-presidential conduct which had been adjudicated during the President's term in office. These three were (1) an action against Theodore Roosevelt and the Board of Police in New York City, which was resolved in the Board's favor in 1904, *People ex rel. Hurley v. Roosevelt,* 179 N.Y. 544, 71 N.E. 1137 (1904); (2) A damage suit against Harry Truman based upon his conduct as a county judge in 1931, resolved in Truman's favor in 1946, *Devault v. Truman,* 354 Mo. 1193, 194 S.W.2d 29 (1946); and (3) a suit against John F. Kennedy in California Superior Court asserting a tort claim from an automobile accident occurring during the 1960 campaign, which was ultimately settled, *Bailey v. Kennedy,* No. 757,200 (Cal.Super.Ct.1962).

However, the case most applicable to this one is *Nixon v. Fitzgerald,* cited previously. In a 5–4 decision, the Supreme Court decided that President Nixon had absolute immunity from a suit brought by A. Ernest Fitzgerald, a management analyst with the Department of the Air Force, whom the President ordered fired because he had given congressional testimony on cost overruns which embarrassed his superiors in the Department of Defense (and presumably embarrassed the President also). Fitzgerald sued for damages. The district court rejected President Nixon's assertion of Presidential immunity. The court of appeals affirmed, but the Supreme Court reversed, holding that the President had absolute immunity from a civil suit for damages resulting from official actions taken by the President while in office. The majority opinion of Justice Lewis Powell was hotly disputed in a dissent by Justice Byron White, in which Justices Blackmun, Brennan and Marshall joined. The majority opinion was in accord with the view of the scholar, Edward S. Corwin, in discussing the President's immunity from judicial process. Edward S. Corwin, *The President: Office and Powers* 138 (3d ed. 1948).

But the facts of *Fitzgerald,* as stated previously, are not the same as those in this case. Mr. Nixon was President when he fired Mr. Fitzgerald and was acting in his capacity as the head of the Executive Branch. Mr. Clinton was not President and was not even the President-elect when the alleged cause of action arose in this case.

The Constitution, of course, is silent on all of this. The framers debated even the subject of whether the President should be subject to impeachment for criminal acts and, if so, who should conduct the trial. There is nothing in the document relating to civil actions. Justice Story, *supra,* was of the mind that the President possessed immunity from civil suit, and the Supreme Court in *Fitzgerald* agreed in a severely divided opinion that the President was civilly immune from suits brought for official actions taken while in office.

Thus, the hard fact is that these issues of immunity, whether absolute or qualified, have been left in the hands of the Judicial Branch, particularly the Supreme Court. This District Court is not activist in nature and is not inclined to "make law" where none

exists. As stated by Chief Justice John Marshall in *Marbury v. Madison*, however: "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

■ This Court recognizes the reasoning of Justice Powell and his thin majority in *Nixon v. Fitzgerald* that the President has absolute immunity from civil damage actions arising out of the execution of official duties of office. However, this Court does not believe that a President has absolute immunity from civil causes of action arising prior to assuming the office. Nowhere in the Constitution, congressional acts, or the writings of any judge or scholar, may any credible support for such a proposition be found. It is contrary to our form of government, which asserts as did the English in the Magna Carta and the Petition of Right, that even the sovereign is subject to God and the law.

Therefore, the President's Motion to Dismiss on Grounds of Presidential Immunity is denied.

## II.

### *Limited or Temporary Immunity from Trial*

■ The question does not end here, however, because the intent of the Supreme Court in *Nixon v. Fitzgerald* would seem to carry this case beyond the question of absolute immunity from civil suit. The language of the majority opinion by Justice Powell is sweeping and quite firm in the view that to disturb the President with defending civil litigation that does not demand immediate attention under the circumstances would be to interfere with the conduct of the duties of the office.

Justice Powell states unequivocally the following: "Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." 457 U.S. at 751, 102 S.Ct. at 2702. He adds:

> In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages.

Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

457 U.S. at 753, 102 S.Ct. at 2703.

Chief Justice Burger expressed the same theme in his concurring opinion: "Exposing a President to civil damages actions for official acts within the scope of the Executive authority would inevitably subject Presidential actions to undue judicial scrutiny as well as subject the President to harassment." 457 U.S. at 762, 102 S.Ct. at 2707.

Of course, in the preceding part of this opinion, this Court has pointed out that President Clinton's alleged acts took place before he was President and that he was not acting in the scope of Executive authority. Nonetheless, the concerns expressed by a majority of the Supreme Court are not lessened by the fact that these alleged actions preceded his Presidency, nor by the fact that his alleged actions would not have been within his official governmental capacity anyway. The problem, still, is essentially the same—the necessity to avoid litigation, which also might blossom through other unrelated civil actions, and which could conceivably hamper the President in conducting the duties of his office. This situation, as stated by Justice Powell in one of the preceding quotations from *Nixon v. Fitzgerald*, could have harmful effects in connection not only with the President but also with the nation in general.

It is therefore the view of this Court that although President Clinton is not entitled to have this action dismissed on the basis of immunity, he should not have to devote his time and effort to the defense of this case at trial while in office.

This is not a case in which any necessity exists to rush to trial. It is not a situation, for example, in which someone has been terribly injured in an accident through the alleged negligence of the President and desperately needs to recover such damages as may be awarded by a jury. It is not a divorce action, or a child custody or child support case, in which immediate personal

needs of other parties are at stake. Neither is this a case that would likely be tried with few demands on Presidential time, such as an *in rem* foreclosure by a lending institution.

The situation here is that the Plaintiff filed this action two days before the three-year statute of limitations expired. Obviously, Plaintiff Jones was in no rush to get her case to court and, in fact, has stated publicly and in her brief that her lawsuit came about in an effort to clear her name of allegations of sexual activity involving then-Governor Clinton. Her complaint, in ¶¶ 41–47, discusses in detail this situation and indicates that suit was brought because of the use of the name "Paula" in an article appearing in *The American Spectator*, in which the author purportedly obtained his information from state troopers, including Defendant Ferguson. Consequently, the possibility that Ms. Jones may obtain a judgment and damages in this matter does not appear to be of urgent nature for her, and a delay in trial of the case will not harm her right to recover or cause her undue inconvenience. For want of better phraseology, this amounts to the granting of temporary or limited immunity from trial as *Fitzgerald* seems to require due to the fact that the primary defendant is the President. The Court believes that such ruling is also permitted under Rule 40 of the Federal Rules of Civil Procedure allowing district courts to place matters upon the trial calendar "as the courts deem expedient." Further, such limited immunity from trial would seem to be justified under the equity powers of the Court.

By putting the case on hold, as far as trial is concerned, the Court avoids any tolling of the statute of limitations problems which might otherwise be presented if the case were dismissed without prejudice. Despite the fact that the President considers himself estopped to object to a refiling, the Court believes that a delay of the trial is the better way to proceed.

This does not mean, however, that the case is put on the shelf for all purposes. There would seem to be no reason why the discovery and deposition process could not proceed as to all persons including the President himself. This approach eliminates the problem that witnesses may die, disappear, become incapacitated, or become forgetful due to the passage of time.

■ Because there is too much interdependency of events and testimony to proceed piecemeal, the allegations against the trooper will be tried at the same time as those against the President. His case is integrally related to the allegations against the President; both cases arose out of the same alleged incident; and while the suit against the Trooper has unrelated matters based upon his alleged actions and statements subsequent to the alleged incident, it would not be possible to try the Trooper adequately without testimony from the President.

## III.

### *Conclusion*

The Court has attempted to follow its understanding of *Nixon v. Fitzgerald* and other cases as well as to adhere to the historical framework involved. Most importantly, the Court has sought to give effect to the full meaning of the separation of powers doctrine originally enunciated by Montesquieu and implicit in the founding fathers' structure of the Constitution. Essential Presidential prerogatives are "rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974).

On the other hand, in situations in which the President was not the holder of his office when the action allegedly arose, there would seem to be no immunity against civil litigation. The rights of Plaintiff Jones as an American citizen must be protected. *Sub Deo et lege* is our law as well as the law of Great Britain. No one, be he King or President, is above the law.

To protect the Office of President, however, from the potential harm that could result from unfettered civil litigation, and to give effect to the policy of separation of powers, it is necessary to provide that the President cannot be tried in the context presented here until he leaves office. President Clinton's term in office, if he is re-elected in 1996, would end no later than January 20, 2001.

**700**

An earlier termination might come on January 20, 1997, which is only slightly over two years away. By permitting discovery as to all including the President, the Court is laying the groundwork for a trial shortly after the President leaves office.

In granting limited or temporary immunity from immediate trial to President Clinton, the Court wishes to emphasize that it holds no brief for alleged sexual harassment, a matter of important concern to many people. The importance of such issue is another reason why there should be no absolute immunity in this case, but only a temporary Presidential immunity from trial.

Finally, the Court must express its awareness that this case is one in which new law is being made. All of the references to historical events and to other cases do not change that fact. In making such a ruling, the Court is also not unmindful of the fact that to this extent the separation of powers has been breached. But it has happened before in many cases including *United States v. Nixon, supra,* and many of the landmark decisions of Chief Justice John Marshall. In the end, the decision must be made by the courts when there is doubt and only limited precedent.

As previously noted, it "is emphatically the province and duty of the judicial department to say what the law is." *Marbury,* 5 U.S. (1 Cranch) at 177. *United States v. Nixon* reaffirmed that statement: "We therefore reaffirm that it is the province and duty of this Court 'to say what the law is' with respect to the claim of privilege presented in this case." 418 U.S. at 705, 94 S.Ct. at 3106. That is what this Court has tried to do, keeping in mind the words of Chief Justice John Marshall that "we must never forget that it is *a constitution* we are expounding." *McCulloch v. Maryland,* 17 U.S. (4 Wheaton) 316, 407, 4 L.Ed. 579 (1819),[4] and that it is intended to endure for generations and to be applied to the various crises of human affairs.

The President's motion seeking immunity from suit is denied. The court will issue a scheduling order in due course.

IT IS SO ORDERED.

---

4. As explained by Judge Robert H. Bork, Chief Justice Marshall was pointing out that "there are differences in the way we deal with different legal materials.... By this [Chief Justice Marshall] meant that narrow, legalistic reasoning was not to be applied to the document's broad provisions, a document that could not, by its nature and uses, 'partake of the prolixity of a legal code.'" ROBERT H. BORK, THE TEMPTING OF AMERICA 145 (1990).