—————————

No. 95-1050
No. 95-1167

—————————

Paula Corbin Jones,                     *
                                        *
     Appellee - Cross-Appellant,        *
                                        *
     v.                                 *
                                        *
William Jefferson Clinton,              *
                                        *
     Appellant - Cross-Appellee.        *
                                        *
Danny Ferguson,                         *
                                        *
     Defendant.                         *
_____
                                        *    Appeals from the United
United States of America; Akhil         *    States District Court
Reed Amar, Southmayd Professor of       *    for the Eastern District
Law Yale Law School; Susan Low          *    of Arkansas.
Bloch, Professor of Law,                *
Georgetown Law School; Harold H.        *
Bruff, Donald Phillip Rothschild        *
Research Professor, George              *
Washington University National Law      *
Center; Susan Estrich, Robert           *
Kingsley Professor of Law and           *
Political Science, University of        *
Southern California Law Center;         *
Richard H. Fallon, Jr., Professor       *
of Law, Harvard Law School;             *
Daniel A. Farber, Henry J.              *
Fletcher Professor & Associate          *
Dean, University of Minnesota Law       *
School; Philip P. Frickey, Faegre       *
& Benson Professor, University of       *
Minnesota Law School; Paul D.           *
Gewirtz, Potter Stewart Professor       *
of Constitutional Law, Yale Law         *
School; Gerald Gunther, William         *
Nelson Cromwell Professor,              *
Stanford Law School; John C.            *
Jeffries, Jr., Emerson G. Spies         *
Professor and Horace W. Goldsmith       *
Research Professor and Academic         *

Associate Dean, University of $\quad$ *
Virginia School of Law; Sanford $\quad$ *
Levinson, W. St. John Garwood & $\quad$ *
W. St. John Garwood Jr. Regents $\quad$ *
Chair in Law, University of Texas $\quad$ *
School of Law; Burke Marshall, $\quad$ *
Nicholas deB. Katzenbach Professor *
Emeritus, Yale Law School; Judith $\quad$ *
Resnik, Orrin B. Evans Professor, $\quad$ *
University of Southern California $\quad$ *
Law Center; Suzanna Sherry, $\quad$ *
Earl R. Larson Professor, $\quad$ *
University of Minnesota Law $\quad$ *
School; Steven H. Shiffrin, $\quad$ *
Professor of Law, Cornell Law $\quad$ *
School; Kathleen M. Sullivan, $\quad$ *
Professor of Law, Stanford Law $\quad$ *
School; Laurence H. Tribe, $\quad$ *
Ralph S. Tyler, Jr. Professor of $\quad$ *
Constitutional Law, Harvard Law $\quad$ *
School; The American Civil $\quad$ *
Liberties Union Foundation; $\quad$ *
Stephen B. Burbank, Robert G. $\quad$ *
Fuller, Jr. Professor of Law, $\quad$ *
University of Pennsylvania Law $\quad$ *
School; William Cohen, C. Wendell *
and Edith M. Carlsmith Professor $\quad$ *
of Law, Stanford University Law $\quad$ *
School; Larry Kramer, Professor of *
Law, New York University Law $\quad$ *
School; Deborah J. Merritt, $\quad$ *
Professor of Law and Women's $\quad$ *
Studies, University of Illinois $\quad$ *
College of Law; Geoffrey P. Miller,*
Kirkland & Ellis Professor of Law, *
The University of Chicago Law $\quad$ *
School; Robert F. Nagel, Ira $\quad$ *
Rothgerber Professor of $\quad$ *
Constitutional Law, University of $\quad$ *
Colorado Law School; Richard $\quad$ *
Parker, Professor of Law, Harvard $\quad$ *
Law School; L.A. Scot Powe, Jr., $\quad$ *
Anne Green Regent Professor of Law,*
University of Texas Law School; $\quad$ *
Stephen B. Presser, Raoul Berger $\quad$ *
Professor of Legal History, $\quad$ *
Northwestern University School of $\quad$ *
Law; Ronald D. Rotunda, Albert E. $\quad$ *
Jenner, Jr. Professor of Law, $\quad$ *
University of Illinois College of $\quad$ *
Law; William Van Alstyne, $\quad$ *
William R. and Thomas C. Perkins $\quad$ *

Professor of Law, Duke University   *
School of Law,                                 *
                                             *
     Amicus Curiae.                *

_____

Submitted:  September 14, 1995

Filed:  January 9, 1996
_____

Before BOWMAN, ROSS, and BEAM, Circuit Judges.

_____

BOWMAN, Circuit Judge.

We have before us in this appeal the novel question whether the person currently serving as President of the United States is entitled to immunity from civil liability for his unofficial acts, i.e., for acts committed by him in his personal capacity rather than in his capacity as President.  William Jefferson Clinton, who here is sued personally, and not as President, appeals from the District Court's decision staying trial proceedings, for the duration of his presidency, on claims brought against him by Paula Corbin Jones.  He argues that the court instead should have dismissed Mrs. Jones's suit without prejudice to the refiling of her suit when he no longer is President.  Mr. Clinton also challenges the District Court's decision to allow discovery to proceed in the case during the stay of the trial.  Mrs. Jones cross-appeals, seeking to have the stays entered by the District Court lifted, so that she might

proceed to trial on her claims.[1]  We affirm in part and reverse in part, and remand to the District Court.[2]

On May 6, 1994, Mrs. Jones filed suit in the District Court against Mr. Clinton and Danny Ferguson, an Arkansas State Trooper who was assigned to Mr. Clinton's security detail during his tenure as governor of Arkansas, for actions alleged to have occurred beginning with an incident in a Little Rock, Arkansas, hotel suite on May 8, 1991, when Mr. Clinton was governor and Mrs. Jones was a state employee.  Pursuant to 42 U.S.C. § 1983 (1988), Mrs. Jones alleges that Mr. Clinton, under color of state law, violated her constitutional rights to equal protection and due process by sexually harassing and assaulting her.  She further alleges that Mr. Clinton and Trooper Ferguson conspired to violate those rights, a claim she brings under 42 U.S.C. § 1985 (1988).  Her complaint also includes two supplemental state law claims, one against Mr. Clinton for intentional infliction of emotional distress and the other against both Mr. Clinton and Trooper Ferguson for defamation.

Mr. Clinton, asserting a claim of immunity from civil suit, filed a motion to dismiss the complaint without prejudice to its refiling when he is no longer President or, in the alternative,

---

[1]In addition to staying the trial on Mrs. Jones's claims against Mr. Clinton, the District Court also stayed trial against Mr. Clinton's co-defendant in the suit, Arkansas State Trooper Danny Ferguson.

[2]In addition to the briefs of the parties, amicus briefs have been filed in support of Mr. Clinton by the United States and by a group of law professors including Professors Amar, Bloch, Bruff, Estrich, Fallon, Jr., Farber, Frickey, Gewirtz, Gunther, Jeffries, Jr., Levinson, Marshall, Resnik, Sherry, Shiffrin, Sullivan, and Tribe; and in support of Mrs. Jones by The American Civil Liberties Union Foundation and by a group of law professors including Professors Burbank, Cohen, Kramer, Merritt, Miller, Nagel, Parker, Powe, Jr., Presser, Rotunda, and Van Alstyne.

for a stay of the proceedings for so long as he is President.  On December 28, 1994, the District Court, rejecting the application of absolute immunity, denied Mr. Clinton's motion to dismiss the complaint.  The court did find, however, that for separation of powers reasons Mr. Clinton was entitled to a "temporary or limited immunity from trial,"[3] and thus granted his request to stay the trial for the duration of Mr. Clinton's service as President.  Jones v. Clinton, 869 F. Supp. 690, 699 (E.D. Ark. 1994).  Concluding that the claims against Trooper Ferguson are factually and legally intertwined with the claims against Mr. Clinton, the court also stayed the trial against Trooper Ferguson for as long as Mr. Clinton is President, but permitted discovery on Mrs. Jones's claims against both Mr. Clinton and Trooper Ferguson to go forward.  On appeal, Mr. Clinton seeks reversal of the District Court's rejection of his motion to dismiss the complaint on the ground of presidential immunity and asks us to order that court to dismiss Mrs. Jones's action in its entirety, without prejudice.  In the alternative, he asks this Court to reverse the decision denying his motion to stay discovery.  Mrs. Jones cross-appeals the District Court's decision to stay the trial of her claims against both Mr. Clinton and Trooper Ferguson.[4]

---

[3]The District Court also justified the stay on the basis of its authority under Rule 40 of the Federal Rules of Civil Procedure and "the equity powers of the Court."  Jones v. Clinton, 869 F. Supp. 690, 699 (E.D. Ark. 1994).

[4]Mr. Clinton argues that we do not have jurisdiction to hear Mrs. Jones's cross-appeal from the orders staying the trial, as they are non-final, interlocutory orders.  We conclude, however, that Mrs. Jones's cross-appeal is "inextricably intertwined" with Mr. Clinton's appeal, which is before us under the immunity exception to the general rule that only final judgments are appealable.  See Mitchell v. Forsyth, 472 U.S. 511, 525 (1985).  Thus the orders staying trial are presently appealable under our "pendent appellate jurisdiction."  See Kincade v. City of Blue Springs, Mo., 64 F.3d 389, 394 (8th Cir. 1995) (analyzing Swint v. Chambers County Commission, 115 S. Ct. 1203 (1995), and concluding that pendent appellate jurisdiction remains a viable

Mr. Clinton argues that this suit should be dismissed solely because of his status as President.  The immunity he seeks would protect him for as long as he is President, but would expire when his presidency has been completed.  The question before us, then, is whether the President is entitled to immunity, for as long as he is President, from civil suits alleging actionable behavior by him in his private capacity rather than in his official capacity as President.  We hold that he is not.

We start with the truism that Article II of the Constitution, which vests the executive power of the federal government in the President, did not create a monarchy.  The President is cloaked with none of the attributes of sovereign immunity.  To the contrary, the President, like all other government officials, is subject to the same laws that apply to all other members of our society.  As the Supreme Court has observed, "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law . . . ."  Butz v. Economou, 438 U.S. 478, 506 (1978).  Nevertheless, mindful that for the sake of the nation's general good the Constitution empowers officials to act within the scope of their official responsibilities, the Supreme Court has recognized "that there are some officials whose special functions require a full exemption from liability" for their performance of official acts.  Id. at 508.  The list of those entitled to absolute immunity from civil liability includes the President of the United States for his official acts,  Nixon v.

_____

concept in the Eighth Circuit).  All issues raised in the appeal and the cross-appeal (with the exception of those portions of the orders concerning the defamation claim against Mr. Clinton, see infra note 7)--the challenges to the non-dismissal of the suit, to the stays of trial, and to the allowance of discovery--are resolved by answering one question:  is a sitting President entitled to immunity, for the duration of his presidency, from civil suit for his unofficial acts?  It is difficult to imagine issues more "intertwined" than these, where answering one question of law resolves them all.

*Fitzgerald*, 457 U.S. 731, 756 (1982); members of Congress for their legislative acts, regardless of motive, under the Speech and Debate Clause, U.S. Const. art. I, § 6, *Dombrowski v. Eastland*, 387 U.S. 82, 84-85 (1967) (per curiam); *Tenney v. Brandhove*, 341 U.S. 367, 372, 377 (1951); judges in courts of general jurisdiction for judicial acts, *Stump v. Sparkman*, 435 U.S. 349, 359-60 (1978); *Pierson v. Ray*, 386 U.S. 547, 554 (1967); prosecutors for prosecutorial functions, *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976); and certain executive officials performing certain judicial and prosecutorial functions in their official capacities, *Butz*, 438 U.S. at 514-15.  In addition, witnesses are entitled to absolute immunity from civil suit for testimony given in judicial proceedings, *Briscoe v. LaHue*, 460 U.S. 325, 334 (1983), and even government officials whose special functions do not require a full exemption from liability may have a more limited qualified immunity for their official acts, *e.g.*, *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) (prison officials); *Wood v. Strickland*, 420 U.S. 308, 321-22 (1975) (school officials); *Scheuer v. Rhodes*, 416 U.S. 232, 247 (1974) (officers of the Executive Branch); *Pierson*, 386 U.S. at 557 (police officers making an arrest).  We are unaware, however, of any case in which any public official ever has been granted any immunity from suit for his unofficial acts, and neither the Supreme Court nor any other court, the District Court excepted, appears to have addressed the precise issue before us today:  whether the President is entitled to immunity for the duration of his presidency when sued for his unofficial actions.

The immunity that has been found for official acts is not the product of a prudential doctrine created by the courts and is not to be granted as a matter of judicial largesse. *Cf. Imbler*, 424 U.S. at 421 ("[O]ur earlier decisions on § 1983 immunities were not products of judicial fiat that officials in different branches of government are differently amenable to suit under § 1983.").  Rather, the question whether to grant immunity to a

government official is "guided by the Constitution, federal statutes, and history" and is informed by public policy. Fitzgerald, 457 U.S. at 747.  "In the case of the President the inquiries into history and policy . . . tend to converge. Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure."  Id. at 748.  Thus the historical "inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers."  Id.

There is no suggestion in this case that federal legislation is the source of either the immunity Mr. Clinton seeks or an abrogation of a previously declared presidential immunity.  Cf. id. at 748 n.27 (noting that the causes of action in the case were "implied" in the Constitution and federal law, and therefore declining to "address directly the immunity question as it would arise if Congress expressly had created a damages action against the President" for his official acts). Nor is presidential immunity of any kind explicit in the text of the Constitution.  Instead, whatever immunity the President enjoys flows by implication from the separation of powers doctrine, which itself is not mentioned in the Constitution, but is reflected in the division of powers among the three branches. See U.S. Const. arts. I, II, III.  The Supreme Court in Fitzgerald, after an exhaustive examination of the history and the constitutional significance of the presidency, held that absolute immunity from civil liability for official acts is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of separation of powers and supported by our history."  457 U.S. at 749.  There is a "special solicitude due to claims alleging a threatened breach of

-8-

essential Presidential prerogatives under the separation of powers."  Id. at 743.

The parties agree, and so do we, that the fundamental authority on the subject of presidential immunity is the plurality opinion in Fitzgerald.  As noted above, the issue before the Court in that case was whether the President is entitled to absolute immunity (rather than qualified immunity or no immunity at all) from personal civil liability for his official acts.  By only a five-to-four majority, the Court held that, "[i]n view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility."  Id. at 756.  By definition, unofficial acts are not within the perimeter of the President's official responsibility at all, even the outer perimeter.[5]  The Court's struggle in Fitzgerald to establish presidential immunity for acts within the outer perimeter of official responsibility belies the notion, here advanced by Mr. Clinton, that beyond this outer perimeter there is still more immunity waiting to be discovered. We thus are unable to read Fitzgerald as support for the proposition that the separation of powers doctrine provides immunity for the individual who serves as President from lawsuits seeking to hold him accountable for his unofficial actions.  See id. at 759 (Burger, C.J., concurring) ("a President, like Members of Congress, judges, prosecutors, or congressional aides--all having absolute immunity--[is] not immune for acts outside official duties").[6]  Moreover, having considered the arguments

_____

[5]We note that the dissenting opinion in the present case does not mention Fitzgerald's "outer perimeter," much less explain how unofficial acts could come within the protected zone.

[6]The dissenting opinion, while liberally citing and quoting Chief Justice Burger's concurrence, post at 27-28, 31, does not mention that the Chief Justice expressly stated that the

put forward in the present case, we cannot discern any reason grounded in the Constitution for extending presidential immunity beyond the outer perimeter delineated in Fitzgerald. Accordingly, we hold that a sitting President is not immune from suit for his unofficial acts.  In this case it is undisputed that most of the acts alleged by Mrs. Jones clearly fall outside the zone of official presidential responsibility, given that they occurred while Mr. Clinton was still governor of Arkansas.[7]

Stressing that the immunity claimed here is only temporary (until the end of Mr. Clinton's presidency), Mr. Clinton and his amici would have us consider the nature of Mrs. Jones's complaint, as well as the timing of the filing of her suit (apparently just within the statute of limitations), and conclude that her suit is neither important nor urgent, and certainly not consequential enough to trump Mr. Clinton's claim to temporal immunity from suit.  But that is not the test.  Mrs. Jones is constitutionally entitled to access to the courts and to the equal protection of the laws.  "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163 (1803).  Mrs. Jones retains that right in her suit against Mr. Clinton, regardless of what her claims may be or when her suit was filed (if otherwise

President is "not immune for acts outside official duties."

[7]Mrs. Jones's state law defamation claim concerns actions alleged to have been taken by Mr. Clinton's presidential press secretary while Mr. Clinton was President.  The question whether these actions fall inside the "'outer perimeter' of [the President's] official responsibility," Nixon v. Fitzgerald, 457 U.S. 731, 756 (1982), so as to come within the scope of the President's absolute immunity for official acts, is not free from doubt.  This particular issue has not been addressed by the District Court, and the record as to the circumstances of the press secretary's statements is not fully developed.  We therefore leave this issue for initial resolution by the District Court after remand and upon a more complete record.

timely filed), provided that she is not challenging actions that fall within the ambit of official presidential responsibility. We further reject the suggestion that Mrs. Jones's motives in filing suit, alleged to be political, should be examined, and that her suit should be dismissed if we are persuaded that her objective in bringing the suit is less than pure. Such an approach would convert a presidential immunity analysis into the taking and weighing of accusations and recriminations, an exercise unnecessary and inappropriate to the proper determination of a claim of immunity based on the Constitution.

Mr. Clinton argues that, if he is presently amenable to suit for his private acts, the proceedings against him inevitably will intrude upon the office of President, in contravention of Fitzgerald's teachings, noting the Court's concern that the "diversion of [the President's] energies by concern with private lawsuits would raise unique risks to the effective functioning of government." 457 U.S. at 751. Thus, Mr. Clinton would have us ignore the line that Fitzgerald draws between official and unofficial acts and instead "balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch," the analysis undertaken by the Court in reaching its decision on the question of presidential immunity for official acts. Id. at 754. But the Court in Fitzgerald was troubled by the potential impact of private civil suits arising out of the President's performance of his official duties on the future performance of those duties, not by whether the President qua individual citizen would have the time to be a defendant in a lawsuit. As the Court explained, "[A] President must concern himself with matters likely to 'arouse the most intense feelings,'" and "it is in precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially with' the duties of his office." Id. at 752 (citations to quoted cases omitted). It is clear from a careful

-11-

reading of <u>Fitzgerald</u> that the justification for the absolute immunity conferred in that case was concern that the President's awareness of his essentially infinite potential personal liability for virtually every official action he takes would have an adverse influence on the presidential decision-making process. The rationale of the <u>Fitzgerald</u> majority is that, without protection from civil liability for his official acts, the President would make (or refrain from making) official decisions, not in the best interests of the nation, but in an effort to avoid lawsuits and personal liability.  This rationale is inapposite where only personal, private conduct by a President is at issue.

Mrs. Jones's claims, except for her defamation claim,[8] concern actions by Mr. Clinton that, beyond cavil, are unrelated to his duties as President.  This lawsuit thus does not implicate presidential decision-making.  If this suit goes forward, the President still will be able to carry out his duties without any concern that he might be sued for damages by a constituent aggrieved by some official presidential act.  Though amenable to suit for his private acts, the President retains the absolute immunity found in <u>Fitzgerald</u> for official acts, and presidential decision-making will not be impaired.  "In defining the scope of an official's absolute privilege, . . . the sphere of protected action must be related closely to the immunity's justifying purposes."  <u>Id.</u> at 755.  We see no connection, much less a close one, between the unofficial actions Mr. Clinton wishes to shield from judicial process and the justifying purposes of presidential immunity as set forth by the Court in <u>Fitzgerald</u>.

Mr. Clinton argues that denying his claim to immunity will give the judiciary <u>carte blanche</u> to intrude unconstitutionally upon the Executive Branch and in fact will disrupt the

---

[8]<u>See</u> <u>supra</u> note 7.

performance of his presidential duties and responsibilities.  As
the argument goes, because a federal court will control the
litigation, the Third Branch necessarily will interfere with the
Executive Branch through the court's scheduling orders and its
powers to issue contempt citations and sanctions.  But Mr.
Clinton's sweeping claim that this suit will allow the judiciary
to interfere with the constitutionally assigned duties of the
Executive Branch, and thus will violate the constitutional
separation of powers doctrine if immunity is not granted, without
detailing any specific responsibilities or explaining how or the
degree to which they are affected by the suit (and, unlike the
dissent, post at 30-31, 32, we think it is Mr. Clinton's burden
to do so), is insufficient ground for granting presidential
immunity, even temporarily.  See Butz, 438 U.S. at 506
("[F]ederal officials who seek absolute exemption from personal
liability for unconstitutional conduct must bear the burden of
showing that public policy requires an exemption of that
scope."); cf. United States v. Nixon, 418 U.S. 683, 713 (1974)
(holding no presidential privilege attaches to presidential
communications subpoenaed in criminal case when asserted
privilege "is based only on the generalized interest in
confidentiality").  We reject Mr. Clinton's argument, and instead
focus our attention on the true separation of powers issues,
which we already have discussed, upon which the question of
presidential immunity hinges.

"[T]he Constitution by no means contemplates total
separation of each of [the] three essential branches of
Government."  Buckley v. Valeo, 424 U.S. 1, 121 (1976) (per
curiam).  Under the checks and balances provided for in the
Constitution, all branches have the capacity to intrude in some
way upon the province of the other branches.  But under the
Constitution, and because of those same checks and balances, no
one branch may intrude upon another to such an extent that the
threatened branch is rendered incapable of performing its
constitutionally assigned duties.  See id. at 122 ("The Framers

-13-

regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.").  What is needed, we believe, to avoid a separation of powers problem is not immunity from suit for unofficial actions, an immunity that would accord the President a degree of protection from suit for his private wrongs enjoyed by no other public official (much less ordinary citizens), but judicial case management sensitive to the burdens of the presidency and the demands of the President's schedule.  The trial court has broad discretion to control the scheduling of events in matters on its docket.[9]  We have every confidence that the District Court will exercise its discretion in such a way that this lawsuit may move forward with the reasonable dispatch that is desirable in all cases, without creating scheduling conflicts that would thwart the President's performance of his official duties.

The unfettered filing of numerous vexatious or frivolous civil lawsuits against sitting Presidents for their unofficial acts that Mr. Clinton and the dissenting opinion in this case envision if Mr. Clinton is not granted temporal immunity from Mrs. Jones's lawsuit is not only speculative, but historically unsupported.  To date no court ever has held that an incumbent President has any immunity from suit for his unofficial actions.  Although our Presidents never have been recognized as having any immunity from lawsuits seeking remedies for civil liabilities

[9]Notwithstanding the District Court's broad discretion in matters concerning its own docket, the alternative rationale for the stays the court granted--its power under Federal Rule of Civil Procedure 40 and "the equity powers of the Court," Jones v. Clinton, 869 F. Supp. at 699--attempts to justify orders that we consider an abuse of discretion.  Such an order, delaying the trial until Mr. Clinton is no longer President, is the functional equivalent of a grant of temporary immunity to which, as we hold today, Mr. Clinton is not constitutionally entitled.

-14-

allegedly incurred by them in their personal dealings, it would appear that few such lawsuits have been filed.[10]

While the President himself and his official conduct inevitably have the high visibility that concerned the Court in Fitzgerald, 457 U.S. at 753 (noting "the visibility of [the President's] office and the effect of his actions on countless people" as setting him up as "an easily identifiable target for suits for civil damages"), his unofficial, private conduct is on a different footing.  Although such conduct may attract widespread attention when someone elects to make it public, the unofficial acts of the person who serves as President, unlike the President's official acts, are not likely to affect "countless people."  Rather, unofficial conduct will affect only those who traffic with the President in his personal capacity.  Thus the universe of potential plaintiffs who might seek to hold the President accountable for his alleged private wrongs via a civil lawsuit is considerably smaller than the universe of potential plaintiffs who might seek to hold the President accountable for his official conduct; in the latter case, the plaintiff could be

---

[10]The parties have identified only three prior instances in which sitting Presidents have been involved in litigation concerning their acts outside official presidential duties.  See also Jones v. Clinton, 869 F. Supp. at 697.  Those suits were against Theodore Roosevelt, Harry S Truman, and John F. Kennedy. In each case, the action was filed before the defendant began serving as President, and the suits against Presidents Roosevelt and Truman were already on appeal before those men assumed the office of President.  People ex rel. Hurley v. Roosevelt, 71 N.E. 1137 (N.Y. 1904) (per curiam mem.); DeVault v. Truman, 194 S.W.2d 29 (Mo. 1946).  It does not appear that either Mr. Roosevelt or Mr. Truman claimed any immunity from suit.  In the action against Mr. Kennedy, he asserted, post-election, that he was temporarily protected from suit under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C. app. §§ 501-93 (1988 & Supp. V 1993), given his status as Commander-in-Chief.  The court denied Mr. Kennedy's motion for a stay, apparently without a written opinion, and the case eventually settled.  Bailey v. Kennedy, No. 757,200 (Cal. Super. Ct. 1962); Hills v. Kennedy, No. 757,201 (Cal. Super. Ct. 1962).

virtually anyone who feels aggrieved by presidential action.  If,
contrary to history and all reasonable expectations, a President
ever becomes so burdened by private-wrong lawsuits that his
attention to them would hinder him in carrying out the duties of
his office, then clearly the courts would be duty-bound to
exercise their discretion to control scheduling and the like so
as to protect the President's ability to fulfill his
constitutional responsibilities.  Frivolous claims, a category
with which the courts are quite familiar, generally can be
handled expeditiously and ordinarily can be terminated with
little or no involvement by the person sued.

Finally, we reject the notion that presidential immunity in
civil cases seeking a remedy for unofficial acts can be conferred
on an ad hoc basis.  There is no constitutional basis for the
proposition that a court, in its discretion, could refuse to
grant immunity to a President in, for example, suits for
arrearages in child support or the case of the "more urgent need"
of a plaintiff seeking injunctive relief, Appellant's Reply Brief
at 21 n. 14, or of a plaintiff who shows exigent circumstances,
while granting immunity from suits for declaratory relief or
money damages where the plaintiff demonstrates no exigency.  A
sitting President is either entitled to immunity from suit for
his unofficial acts, or he is not.  As we have noted,
presidential immunity is not a prudential doctrine fashioned by
the courts.  Mr. Clinton is entitled to immunity, if at all, only
because the Constitution ordains it.  Presidential immunity thus
cannot be granted or denied by the courts as an exercise of
discretion.  The discretion of the courts in suits such as this
one comes into play, not in deciding on a case-by-case basis
whether a civil complaint alleging private wrongs is sufficiently
compelling so as to be permitted to proceed with an incumbent
President as defendant, but in controlling the scheduling of the
case as necessary to avoid interference with specific,
particularized, clearly articulated presidential duties.  If the

-16-

trial preliminaries or the trial itself become barriers to the effective performance of his official duties, Mr. Clinton's remedy is to pursue motions for rescheduling, additional time, or continuances.  Again, we have every confidence that the District Court will discharge its responsibility to protect the President's role as our government's chief executive officer, without impeding Mrs. Jones's right to have her claims heard without undue delay.  If either party believes the court is failing to discharge that responsibility, the proper course is to petition this Court for a writ of mandamus or prohibition.

To sum up, we hold that the Constitution does not confer upon an incumbent President any immunity from civil actions that arise from his unofficial acts.  Accordingly, we affirm the District Court's decision denying Mr. Clinton's motion to dismiss Mrs. Jones's suit and the decision to allow discovery in this case to proceed.  For the same reason, we reverse the District Court's order granting Mr. Clinton's motion to stay the trial of this matter for the duration of his presidency.  Mrs. Jones's appeal of the District Court's post-judgment order staying discovery during the pendency of this appeal is dismissed as moot, as is Mr. Clinton's challenge to our jurisdiction to hear that appeal.  The case is remanded to the District Court, with instructions to lift the stays that the court has entered and to allow Mrs. Jones's suit against Mr. Clinton and Trooper Ferguson to proceed in a manner consistent with this opinion and the Federal Rules of Civil Procedure.

BEAM, Circuit Judge, concurring specially.

I concur in the conclusions reached by Judge Bowman.  I write separately to express my views on three matters which are, in my mind, insufficiently discussed by either the opinion of the court or the dissent.

-17-

Mr. Clinton and his amicus vigorously present their position on the potential impact of this civil litigation on the office and the duties of the presidency. And, without question, they raise matters of substantial concern given the constitutional obligations of the office. What is missing from their arguments is a coordinate and balanced analysis of the impact a stay of the litigation, including an embargo on all discovery, will have on Ms. Jones and her claims. This should also be of substantial concern because it involves fundamental constitutional rights governing access to and use of the judicial process under the First and Fourteenth Amendments and the right to a timely jury trial under the Seventh Amendment, to identify only a few specific omissions.

It is incorrect, in my view, for Mr. Clinton and his amicus to assert that the delay is of no consequence to Ms. Jones. Aside from the adage that justice delayed is justice denied, Ms. Jones faces real dangers of loss of evidence through the unforeseeable calamities inevitable with the passage of time. To argue that this problem may be dealt with by episodic exceptions when the risk of loss is apparent is to miss the point. Only rarely does life proceed in such a foreseeable fashion.

The dissent states, "[w]here there is no urgency to pursue a suit for civil damages, the proper course is to avoid opportunities for breaching separation of powers altogether by holding the litigation in abeyance until a President leaves office." Infra at 30. The dissent urges total abeyance of both discovery and trial. I perceive this, perhaps incorrectly, to be an implicit finding that there is, indeed, no real urgency to Ms. Jones's suit for civil damages and, thus, the constitutionally based separation of powers doctrine demands that this litigation, in all of its manifestations, be abated until Mr. Clinton leaves office--this to protect the constitutional grant of executive authority given to a

sitting President. In my view, this greatly oversimplifies the issues in this appeal and overstates the danger to the presidency. The potential for prejudice to Ms. Jones, as earlier noted, reaches, or at least approaches, constitutional magnitude. If a blanket stay is granted and discovery is precluded as suggested by Mr. Clinton and his amicus, Ms. Jones will have no way that I know of (and none has been advanced by those counseling this course of action),[1] to perpetuate the testimony of any party or witness should they die or become incompetent during the period the matter is held in abeyance. Should the death or incompetence of a key witness occur, proving the elements of Ms. Jones's alleged causes of action will become impossible. Thus, her "chose in action" would be obliterated, or at least substantially damaged if she is denied reasonable and timely access to the workings of the federal tribunal.

It is true that some of Ms. Jones's claims would survive to her guardian, heirs or assigns in the event of her incompetence or death, assuming a way is found to preserve crucial evidence. Her claim of defamation is in a different class. It almost certainly would be totally extinguished should either party die. This would also include her defamation claims asserted against Trooper Ferguson.

From the pleadings, the forum law applicable to her defamation claims is not easily discernible and I have not canvassed the law in every conceivable jurisdiction. It seems appropriate to note, however, that under Arkansas law, for example, the defamation claims would expire on the death of either party. See Ark. Code Ann. § 16-62-101(b) (Michie 1987 & Supp. 1993); Parkerson v. Carrouth, 782 F.2d 1449, 1451-53 (8th Cir. 1986). I think Arkansas expresses the rule of most jurisdictions. Accordingly, one can

---

[1] Only the amicus brief filed by the Solicitor General fleetingly mentions this problem, but it offers no solutions.

readily see the irreparable harm that a stay of this claim (assuming its viability as we must at this point) will bring to Ms. Jones.  Thus, the total stay requested by Mr. Clinton and his amicus, and embraced by the dissent, will immediately produce a threat of irreparable injury.

Even though a sitting President is not immune from liability for his nonofficial conduct, it is fair to note that some of Ms. Jones's defamation claims, as presently alleged, may well fit within the "outer perimeter" of official responsibility as discussed in <u>Nixon v. Fitzgerald</u>, 457 U.S. 731, 756 (1982).  Thus, at the very least, absolute immunity defenses to these claims should be immediately taken up and decided by the district court.

The dissent appears to recognize the potential for irreparable harm to Ms. Jones and proposes that her interests--as balanced against the interests of Mr. Clinton--be analyzed and weighed by shifting the burden of establishing "irreparable injury" to Ms. Jones, <u>along with</u> the additional burden on Ms. Jones of showing "that the immediate adjudication of the suit will not significantly impair the President's ability to attend to the duties of his office."  <u>Infra</u> at 30-31.  The dissent cites no established authority or case precedent for this burden-shifting strategy, even by analogy to some reasonably comparable situation.  I have discovered none.  In this regard, there is no way, in my view, that a litigant could ever successfully shoulder the burden assigned by the dissent, especially if all discovery is prohibited.  To determine, as a precondition to "immediate adjudication," that at some future time the lawsuit will not significantly impair the duties of the President would be an impossible task.  Thus, the dissent's proposed safety valve is valueless, except in its recognition of the potential for irreparable harm to Ms. Jones caused by the total stay.

-20-

Notwithstanding the separation of powers concerns outlined by the dissent, the burden, in my view, should be shouldered, as in any other civil litigation, by the party seeking to delay the usual course of discovery and trial. Otherwise, we will have established requirements of insurmountable proportions for any litigant who may have a viable and urgent civil claim against a sitting President or perhaps, against other important governmental figures with constitutionally established duties.

This approach to staying litigation is a well-established legal concept. Traditionally, an applicant for a stay has the burden of showing specific hardship or inequity if he or she is required to go forward. Landis v. North American Co., 299 U.S. 248, 254-56 (1936). This may be a sub silentio recognition of the terms of the Seventh Amendment. However, great public interest may authorize a stay which is not immoderate or oppressive in its consequences. Id. at 256. Thus, while there is a balancing to be done, the presumption is on Ms. Jones's, not Mr. Clinton's, side. When stays are granted, after the petitioner for the stay meets his "heav[]y" burden of showing "the justice and wisdom of a departure from the beaten track," they must be narrowly tailored or they will amount to an abuse of discretion. Id. Of course, the justice and wisdom of such a departure will take into account, in this case, that one of the parties is the sitting President of the United States. See generally United States v. Poindexter, 732 F. Supp. 142, 146 (D.D.C. 1990). Nonetheless, I agree with Judge Bowman that Mr. Clinton should carry this initial burden, not Ms. Jones.

In determining whether to stay the litigation, Ms. Jones must be given the benefit of the concept that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever [s]he receives an injury." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 161 (1803) (emphasis added). More recently, and explicitly, access to the

-21-

courts has been held to be a "fundamental constitutional right" founded in the Due Process and Equal Protection clauses.  See Bounds v. Smith, 430 U.S. 817, 828 (1977).  This right is pivotal to our system of governance in that "civil rights actions [such as the 42 U.S.C. § 1983 action at issue here] are of `fundamental importance . . . in our constitutional scheme' because they directly protect our most valued rights."  Id. at 827 (quoting Johnson v. Avery, 393 U.S. 483, 485 (1969)).

Surely, if civil rights actions are of such importance that they may not be impeded or delayed by a person's incarceration, there must be at least an equal public interest in an ordinary citizen's timely vindication of his or her most fundamental right against alleged abuse of power by governmental officials.  As noted, Ms. Jones has, in part, brought a 42 U.S.C. § 1983 action, not a mere run-of-the-mill tort claim.  The violation of civil rights through the abuse of state government positions of power has been of such great public concern that Congress felt it necessary to enact section 1983 to protect the citizenry and to hold persons with positions of power accountable for its abuse.  Thus, this is not a minor civil dispute to which one can assign no public interest beside that on the side of the presidency.  The balance to be considered, therefore, is not completely one sided.  There is a public interest, as well as an individual interest, on Ms. Jones's side of the scale.  These interests are of such weight that, at least provisionally, Ms. Jones is entitled to proceed.

**II.**

I now turn to the potential impact upon the duties of the presidency.  The dissent eloquently and properly raises several unanswered questions, infra at 29-30, concerning judicial branch interference with the functioning of the presidency should this suit be allowed to go forward.  Again, I readily admit that these are matters of major concern.  In my view, however, these concerns

for interbranch interference are greatly overstated by Mr. Clinton and his amicus. Indeed, they are not appreciably greater than those faced in many other instances in which a sitting President interfaces as a party, witness, or target with the judicial and legislative branches of the government. Judge Bowman notes at least three earlier instances in which sitting Presidents have been involved in civil litigation outside of official presidential duties. <u>Supra</u> at 14 & n.10. Also in the past, under appropriate circumstances "several American Presidents and former Presidents have given testimony under oath in judicial or quasi-judicial settings." 1 Ronald D. Rotunda & John E. Nowak, <u>Treatise on Constitutional Law</u> § 7.1 at 572 (2d ed. 1992). Former and sitting Presidents have previously submitted, either voluntarily or involuntarily, to questions under oath. <u>Id.</u> By doing so, they implicitly submitted to the common law rule, expressed by Lord Hardwicke, "that the public has a right to every man's evidence" 8 John H. Wigmore, <u>Evidence</u> § 2192, at 71 (John McNaughton ed. rev. 1961)(quoting 12 Cobbett's Parliamentary History 675, 693 (1942)).

> Is there any reason why this right should suffer an exception when the desired knowledge is in the possession of a person occupying at the moment the office of <u>chief executive</u> of a state?
>
> There is no reason at all. His temporary duties as an official cannot override his permanent and fundamental duty as a citizen and as a debtor to justice.

<u>Id.</u> at § 2370(c) (emphasis in original).

As a sitting President, Richard Nixon was a defendant in at least two civil actions. In one, Mr. Nixon was ordered by the Supreme Court to produce tapes subpoenaed by a special prosecutor. <u>United States v. Nixon</u>, 418 U.S. 683, 713 (1974). In the other, <u>National Treasury Employees Union v. Nixon</u>, 492 F.2d 587 (D.C. Cir. 1974) the court held that a President is amenable to legal process,

even in his official capacity, if absolutely necessary.  Mr. Nixon did not appeal that determination.

Also, as noted by Rotunda and Nowak, President Jimmy Carter gave videotaped testimony during his presidency that was presented at the criminal conspiracy trial of two Georgia state officials. See 1 Rotunda & Nowak § 7.1 at 575.  Later, then-sitting President Carter provided videotaped testimony for a grand jury investigating charges that Robert Vesco had enlisted White House aid to quash extradition proceedings against him.  Id.  Finally, still-sitting President Carter was interviewed under oath by Justice Department investigators probing "for criminal, civil, and administrative purposes" any offenses resulting from Billy Carter's relations with the Libyan Government.  Id.  Further, President Gerald Ford was compelled to testify by videotape deposition in the criminal trial of Lynette (Squeaky) Fromme, who was charged with attempting to assassinate  the President.  Id. at 581.  There are numerous other instances in which a sitting President has both voluntarily or involuntarily appeared at judicial proceedings and before committees of Congress.  Such instances have involved, at least, Presidents Thomas Jefferson, James Monroe, Abraham Lincoln and Ulysses S. Grant.  See id. § 7.1.

I concede that most of these situations have arisen within the framework of governmental operations.  I further concede that there is not a perfect fit between the interests at play in the cited interbranch proceedings and the civil litigation at issue here.  My point is that each named President has obviously scheduled these encounters without creating a cataclysmic episode in which the constitutional duties of the office have been compromised.

Ms. Jones's complaint presents relatively uncomplicated civil litigation, the discovery for which can and should be carried out with a minimum of impact on the President's schedule.  It is doubtful, for instance, that more than one, perhaps two, face-to-

-24-

face pretrial encounters between the President and Ms. Jones's representatives need to occur. Indeed, there is not even a requirement that parties be present at the trial of civil litigation and with some frequency they are not. At the bottom line, the availability of written interrogatories, written requests for admissions and written stipulations of undisputed facts, as allowed by the Federal Rules of Civil Procedure, would indicate that the actual impact of this litigation on the duties of the presidency, if that is Mr. Clinton's real concern, is being vastly magnified, especially assuming the trial judge's careful supervision of the litigation with maximum consideration of the President's constitutional duties.

## III.

My final concern involves Trooper Danny Ferguson. Even assuming, for sake of argument, the validity of every constitutional claim or defense advanced by Mr. Clinton, I can find no basis for staying discovery or trial of the claims against Trooper Ferguson. Whether private citizen or President, it is unlikely that Mr. Clinton would choose to be present at the deposition of Trooper Ferguson or any sundry witness; certainly he would not be required to attend and no prejudice is likely to result from his absence. Neither would he need to be directly concerned with other discovery directed to Trooper Ferguson although it might, admittedly, affect his interests. Even so, I find no separation of powers or other constitutional basis for a stay for this portion of the litigation, especially the discovery process.[2]

## IV.

---

[2]Any problems that arise from attempts by Trooper Ferguson to depose or otherwise conduct discovery from Mr. Clinton, if resisted, are, in my view, separate from the issues raised in this appeal.

I in no way seek to downplay the concerns outlined by the dissent. At the same time, I feel that Judge Bowman's opinion reasonably charts a fair course through the competing constitutional waters and does so without serious injury to the rights of any party. As I have attempted to stress, nothing prohibits the trial judge from halting or delaying or rescheduling any proposed action by any party at any time should she find that the duties of the presidency are even slightly imperiled. With this understanding, I concur.

ROSS, Circuit Judge, dissenting.

I respectfully dissent from the majority opinion. Instead, I would affirm the judgment of the district court concluding that the civil action should not be dismissed, but stayed during the President's term in office. Further, I would reverse the district court's conclusion allowing discovery to proceed.

In my opinion, the language, logic and intent of <u>Nixon v. Fitzgerald</u>, 457 U.S. 731 (1982), although set in the context of official acts, applies with equal force to the present factual scenario and directs a conclusion here that, unless exigent circumstances can be shown, private actions for damages against a sitting President of the United States, even though based on unofficial acts, must be stayed until the completion of the President's term.

The <u>Fitzgerald</u> decision was derived from both the functional necessities of the President's execution of Article II duties, and the principle that no branch should be subject to crippling incursions by another branch. The Court's reasoning is highly instructive in the present case because it demonstrates the importance of insulating the President from the disruptive effects of private suits against him, whether based on official or

unofficial acts.  The Fitzgerald Court placed primary reliance on the prospect that the President's discharge of his constitutional powers and duties would be impaired if he were subject to suits for damages.  The Court stated, "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government."  Id. at 751.

This "diversion of energies" argument refers not only to the concern with whether the President will execute his official duties in a fearless and impartial manner, but also recognizes that the "President occupies a unique position in the constitutional scheme," one that "distinguishes him from other executive officials."  Id. at 749, 750.  Article II, § 1 of the Constitution uniquely vests the entire executive power in the President.  No other branch of government is entrusted to a single person.  It is this singularity of the President's constitutional position that calls for protection from civil litigation.

The unofficial nature of the alleged events would not make defending a private suit for civil damages any less of a burden on the President's time and attention and therefore on his constitutional responsibilities, or any less of a "risk[] to the effective functioning of government."  Id. at 751.  When the President is called upon to defend himself during his term of office, even in actions wholly unrelated to his official responsibilities, the dangers of intrusion on the authority and functions of the Executive Branch are both real and obvious.  The burdens and demands of civil litigation can be expected to impinge on the President's discharge of his constitutional office by forcing him to divert his energy and attention from the rigorous demands of his office to the task of protecting himself against personal liability.  That result would disserve the substantial public interest in the President's unhindered execution of his

duties and would impair the integrity of the role assigned to the President by Article II of the Constitution.

Further, the <u>Fitzgerald</u> majority was concerned with the possibility that the "sheer prominence of the President's office" makes a President "an easily identifiable target for suits for civil damages." <u>Id</u>. at 752-53. In his concurrence, Chief Justice Burger noted the possibility that private suits for damages against a President could be used for purposes of harassment and extortion. <u>Id</u>. at 762, 763 (Burger, C.J., concurring). While stated in the context of official acts, Chief Justice Burger's concurrence applies with equal force to the present case:

> The need to defend damages suits would have the serious effect of diverting the attention of a President from his executive duties since defending a lawsuit today -- even a lawsuit ultimately found to be frivolous -- often requires significant expenditures of time and money, as many former public officials have learned to their sorrow. . . . When litigation processes are not tightly controlled . . . they can be and are used as mechanisms of extortion. Ultimate vindication on the merits does not repair the damage.

<u>Id</u>. at 763 (Burger, C.J., concurring).

The same concerns are implicated in the present action as well, where such suits could be pursued merely for the purpose of gaining partisan political disruption, public notoriety, unwarranted financial gain, or potential extortion. Indeed, any number of potential private claims could be contrived to entangle a sitting President in embarrassing or protracted litigation, alleging unwitnessed one-on-one encounters that are extremely difficult to dispose of by way of a pretrial motion.

The <u>Fitzgerald</u> Court also recognized that presidential immunity is "rooted in the separation of powers under the Constitution." <u>Id</u>. at 753 (quoting <u>United States v. Nixon</u>, 418

-28-

U.S. 683, 708 (1974)). The Court noted that the Framers of the Constitution assumed that "the President, personally, was not the subject to any process whatever. . . . For [that] would . . . put it in the power of a common justice to exercise any authority over him and stop the whole machine of Government." Id. at 751 n.31 (quoting Journal of William Maclay 167 (E. Maclay ed. 1890) (alteration in original). Quoting Thomas Jefferson, the Supreme Court further underscored its concern that exercising jurisdiction over a President would create the opportunity for unconstitutional judicial intrusion upon Executive authority:

> [W]ould the executive be independent of the judiciary, if he were subject to the commands of the latter, & to imprisonment for disobedience; if the several courts could bandy him from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties?

Id. (quoting 10 The Works of Thomas Jefferson 404 (P. Ford ed. 1905)).

In my view, the separation of powers doctrine requires that private civil actions against a sitting President for unofficial acts must be stayed during the President's term in office. Civil lawsuits against a President create opportunities for the judiciary to intrude upon the Executive's authority, set the stage for potential constitutional confrontations between courts and a President, and permit the civil justice system to be used for partisan political purposes. It cannot be denied that the potential for such conflicts is inherent in subjecting any President personally to a court's jurisdiction.

The majority concludes the remedy for interference with the performance of the President's official duties by the demands of discovery and trial preparations and proceedings is the filing of motions with the court for rescheduling, additional time or continuances. Ante at 16. If this route proves to be

-29-

unsuccessful, the majority suggests the President should be required to petition this Court for a writ of mandamus or prohibition, id., and arguably then to appeal any adverse decision to the Supreme Court. This suggestion, however, clearly epitomizes the separation of powers conflict inherent in a system that subjects a sitting President personally to the court's jurisdiction for the purpose of private civil litigation.

The majority's decision leaves as many questions unanswered as it answers: Must a President seek judicial approval each time a scheduled deposition or trial date interferes with the performance of his constitutional duties? Is it appropriate for a court to decide, upon the President's motion, whether the nation's interest in the unfettered performance of a presidential duty is sufficiently weighty to delay trial proceedings? Once a conflict arises between the court and the President as to the gravity of an intrusion on presidential duties, does a court have the authority to ignore the President's request to delay proceedings? Finally, can a court dictate a President's activities as they relate to national and international interests of the United States without creating a separation of powers conflict? While the majority would encourage other courts to exercise "judicial case management sensitive to the burdens of the presidency," ante at 13, only a stay of civil litigation during a President's term in office will ensure the performance of Executive duties unencumbered by the judiciary and thereby avoid separation of powers conflicts.

While noting that the separation of powers doctrine "does not bar every exercise of jurisdiction over the President of the United States," Fitzgerald, 457 U.S. at 753-54, in view of the significant encroachment upon presidential duties and independence that would necessarily accompany litigation, the Fitzgerald Court admonished that, before asserting such jurisdiction, a court "must balance the constitutional weight of the interest to be served [by the litigation] against the dangers of intrusion on the authority and

-30-

functions of the Executive Branch."  Id. at 754 (emphasis added) (citing Nixon v. GSA, 433 U.S. 425, 443 (1977); United States v. Nixon, 418 U.S. at 703-13)).

Where there is no urgency to pursue a suit for civil damages, the proper course is to avoid opportunities for breaching separation of powers altogether by holding the litigation in abeyance until a President leaves office.  The cause of action should be stayed unless the plaintiff can show that he or she will suffer irreparable injury without immediate relief and that the immediate adjudication of the suit will not significantly impair the President's ability to attend to the duties of his office.

It is important to keep in mind that the issue here is not whether the President may be required to answer claims based on unofficial conduct, but when.  This conclusion merely delays, rather than defeats, the vindication of the plaintiff's private legal interests, and thus is far less burdensome for a plaintiff than the absolute immunity recognized in Fitzgerald.  A stay for the duration of the President's service in office would not prevent Jones from ultimately obtaining an adjudication of her claims. Rather, staying the litigation will protect the important public and constitutional interests in the President's unimpaired performance of his duties, while preserving a plaintiff's ability to obtain resolution of his or her claims on the merits. Postponing adjudication of private damage actions will rarely defeat a plaintiff's ability to ultimately obtain meaningful relief.  "[W]e do well to bear in mind that the focus must not be simply on the matter of judging individual conduct in a fact-bound setting; rather, in those familiar terms of John Marshall, it is a Constitution we are expounding.  Constitutional adjudication often bears unpalatable fruit.  But the needs of a system of government sometimes must outweigh the right of individuals to collect damages."  Id. at 758-59 (Burger, C.J., concurring).

-31-

The well-known travail of litigation and its effect on the ability of the President to perform his duties, as well as the subjection of the President to the ongoing jurisdiction of the courts and the attendant impact on the separation of powers, dictate the postponement of non-exigent, private civil damages litigation until the President leaves office.

In my opinion, the stay should include pretrial discovery, as well as the trial proceedings, because discovery is likely to pose even more intrusive and burdensome demands on the President's time and attention than the eventual trial itself. Similarly, I would grant a stay of proceedings against a co-defendant of a sitting President where, given all the circumstances, the claims against the co-defendant cannot proceed without materially diminishing the effectiveness of a stay of proceedings against the President. I agree with the district court's conclusion here that a stay of the claims against Trooper Ferguson is essential if the President is to be fully protected.

Out of respect for the separation of powers and the unique constitutional position of the President, I conclude the President ordinarily should not be required to defend himself against civil actions until after the completion of his service in office. Therefore I would hold that to rebut the presumption that private suits against a sitting President should not go forward during the President's service in office, the plaintiff should have to demonstrate convincingly both that delay will seriously prejudice the plaintiff's interests and that immediate adjudication of the suit will not significantly impair the President's ability to attend to the duties of his office. Absent such a showing, the litigation should be deferred.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.